## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LYNN SCOTT, LLC; THE FARMER'S
WIFE, LLC; THUAN LUU; OLD
CROWN, INC.; LA MESA LLC; 132
DEGREES, LLC; MDR, LLC;
MOMOBBQ, CO., LLC; MF TASTY LLC;
IOWA CITY COFFEE COMPANY, on
behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.

GRUBHUB INC.,

      Defendant.

Case No. 1:20-CV-06334
Honorable LaShonda A. Hunt

## FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

JURISDICTION AND VENUE ..........................................................................3

PARTIES ..............................................................................................................3

FACTUAL ALLEGATIONS ...............................................................................5

    A.   Grubhub's Food Ordering Website and Mobile Apps     5

    B.   Grubhub Tells Consumers It's Working Cooperatively with
Restaurants     7

    C.   Grubhub Decides to Add Unaffiliated Restaurants to Its Website
and Mobile Apps Without the Restaurants' Permission     8

    D.   Grubhub's Unauthorized Use of Restaurants' Names and Logos
Misleads Consumers and Harms Restaurants     10

        1.   Restaurants Have Good Reasons for Choosing Not To Work With
Grubhub ................................................................................10

        2.   Grubhub Knows Restaurants Don't Want Its Business and Tells
Drivers to Disguise Their Affiliation with Grubhub ................................14

        3.   Consumers Continue to Believe Restaurants on Grubhub are
Working Cooperatively with Grubhub .......................................................15

        4.   Customer Confusion Leads to Poor Experiences that Hurt
Restaurants' Hard-Earned Reputations......................................................17

        5.   Grubhub Diverts and Impairs Demand for Local Restaurants ................19

    E.   Grubhub Knows It Is Harming Restaurants and Uses That Harm
to Force Restaurants Into Unwanted Partnerships     21

PLAINTIFFS' EXPERIENCE .............................................................................22

    A.   Lynn Scott, LLC     22

    B.   The Farmer's Wife, LLC     25

    C.   Thuan Luu     27

    D.   Old Crown, Inc.     29

    E.   La Mesa LLC     30

F.     132 Degrees, LLC     31

G.     MDR, LLC     33

H.     Momobbq, Co., LLC     35

I.     MF Tasty LLC     36

J.     Iowa City Coffee Company     37

CLASS ALLEGATIONS ..................................................................39

FIRST CAUSE OF ACTION...........................................................41

Violation of Lanham Act – Section 43(a)     41

SECOND CAUSE OF ACTION .......................................................43

Violation of Lanham Act – Section 32     43

PRAYER FOR RELIEF .....................................................................45

DEMAND FOR JURY TRIAL...........................................................45

## INTRODUCTION

1.     For fifteen years, Grubhub told consumers it had partnered with local restaurants to offer coordinated takeout or delivery services. By ordering through Grubhub, consumers were promised "a direct line into the kitchen, avoiding the inefficiencies, inaccuracies and frustrations associated with paper menus and phone orders."

2.     But in late 2019, Grubhub saw it was losing market share to competitors and decided it needed to act fast to attract new users and retain its existing customer base. So Grubhub began researching which restaurants were most popular with consumers—and then added those restaurants to its platform without permission.

3.     Grubhub's unauthorized use of popular restaurants' names and logos had the desired effect. Soon Grubhub was reporting revenues that exceeded its expectations and telling shareholders they could expect to see continued growth as a result of its new strategy. A few months later, Grubhub announced it was selling its thriving business for $7.3 billion—more than twice what the company was worth before Grubhub started adding restaurants to its platform without their consent.

4.     Grubhub's financial success has come at restaurants' expense. Consumers still think they're getting a "direct line into the kitchen." When they see a restaurant's name, logo, address, and menu on the Grubhub platform, they reasonably believe that the restaurant is affiliated with Grubhub and working closely with Grubhub's delivery drivers to provide them with accurate, reliable, and timely service.

5.     Instead, when consumers order from a restaurant that has been included on the platform without its consent, the result is a "suboptimal diner experience rife with operational challenges"—or as Grubhub's CEO succinctly put it, "the diner experience sucks." In many instances, the restaurant is unable to even fill the order because Grubhub posted an inaccurate menu.

6.     Consumers understandably blame the restaurants, who they think have partnered with Grubhub and are on the Grubhub platform willingly. The end result for restaurants is significant damage to their hard-earned reputations, loss of control over their customers' dining experiences, loss of control over their online presence, and reduced consumer demand for their services.

7.     Plaintiffs own ten of the restaurants Grubhub added to its online platform without permission, and bring this proposed class action on behalf of more than 150,000 restaurants whose names and logos were likewise used without permission.

8.     Plaintiffs seek a judgment (a) finding that Grubhub has violated the Lanham Act by using restaurant names and logos without authorization and in a manner likely to confuse consumers; and (b) ordering that Grubhub cease its unlawful conduct, turn over its ill-gotten gains, and pay damages to the restaurants it has harmed.

9.     Nor is there any other prominent disclosure to consumers that a particular restaurant's name or logo is used without permission; that the restaurant will not be working cooperatively with Grubhub to provide accurate, reliable, and timely service; or that because Grubhub is offering food services from the restaurant without consent,

there is a much greater likelihood that the order will take longer to fill, will be filled incorrectly, will be delivered cold, or will eventually be cancelled altogether.

10.     Because Grubhub does not tell consumers any of this, they continue to believe Grubhub is working cooperatively with the restaurants on its platform to provide accurate, reliable, and timely service. This has led to a great deal of confusion and frustration for consumers who think they are getting a "direct line to the kitchen."

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. Plaintiffs' claims are based on violations of the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*

12.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; in the aggregate, there are more than 100 members in the proposed class; and at least one class member is a citizen of a state different from Defendant.

13.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant Grubhub resides in this district.

## PARTIES

14.     Plaintiff Lynn Scott, LLC, is a North Carolina limited liability company with its principal office in Durham, North Carolina. Lynn Scott owns and operates Antonia's restaurant in Hillsborough, North Carolina.

15.     Plaintiff The Farmer's Wife, LLC, is a California limited liability company with its principal place of business in Sebastopol, California. The Farmer's Wife owns and operates The Farmer's Wife restaurant in Sebastopol, California.

16.     Plaintiff Thuan Luu is a citizen of California residing in Oxnard, California. She is the owner and operator of the Ragin' Crawfish restaurant in Oxnard, California.

17.     Plaintiff Old Crown, Inc., is an Indiana corporation with its principal place of business in Fort Wayne, Indiana. Old Crown owns and operates Old Crown Coffee Roasters in Fort Wayne, Indiana.

18.     Plaintiff La Mesa LLC is an Illinois limited liability company with its principal place of business in St. Charles, Illinois. La Mesa owns and operates La Mesa Modern Mexican restaurant in St. Charles, Illinois.

19.     Plaintiff 132 Degrees, LLC, is a Virginia limited liability company with its principal place of business in Fredericksburg, Virginia. 132 Degrees owns and operates the Fahrenheit 132º restaurant in Fredericksburg, Virginia.

20.     Plaintiff MDR, LLC, is a Maryland limited liability company with its principal place of business in Reisterstown, Maryland. MDR owns and operates El Paraiso restaurant in Reisterstown, Maryland.

21.     Plaintiff Momobbq, Co., LLC, is a Pennsylvania limited liability company with its registered office in Camp Hill, Pennsylvania. Momobbq owns and operates the MoMoBBQ restaurant in Mechanicsburg, Pennsylvania.

22.     Plaintiff MF Tasty LLC is an Oregon limited liability company with its principal office in Bend, Oregon. MF Tasty LLC is the owner and operator of MF Tasty, a food cart located in Portland, Oregon. MF Tasty is also the owner of the word mark "MF Tasty," which was registered on the Principal Register of the United States Patent and Trademark Office on January 28, 2020 (Registration No. 5970340).

23.     Plaintiff Iowa City Coffee Company is an Iowa corporation with its home office in North Liberty, Iowa. Iowa City Coffee Company owns and operates Heirloom Salad Company cafes and The Java House coffee shops in Iowa City, Iowa, and North Liberty, Iowa. Iowa City Coffee Company owns the word mark "Heirloom Salad Company," which was registered on the Supplemental Register of the United States Patent and Trademark Office on October 9, 2018 (Registration No. 5582479), and on the Principal Register of the United States Patent and Trademark Office on August 23, 2022 (Registration No. 6826619). Iowa City Coffee Company has also registered "The Java House" mark with the Iowa Secretary of State (Certificate No. W01117183).

24.     Defendant Grubhub Inc. is a Delaware corporation with a principal place of business in Chicago, Illinois.

## FACTUAL ALLEGATIONS

### A.     Grubhub's Food Ordering Website and Mobile Apps

25.     Defendant Grubhub operates a highly successful online platform that connects users with local restaurants for takeout or delivery. Consumers can access the Grubhub platform through a number of branded websites and mobile apps, including Grubhub, Seamless, LevelUp, AllMenus, and MenuPages.

26.     By acting as an intermediary between consumers looking to order food and restaurants looking for additional customers, Grubhub can offer a number of potential benefits to consumers, restaurants, and to Grubhub itself.

27.     For consumers, Grubhub boasts that it offers "a 'direct line' into the kitchen, avoiding the inefficiencies, inaccuracies and frustrations associated with paper menus and phone orders." Grubhub coordinates with its restaurant partners to ensure consumers receive accurate information and a positive consumer experience. Consumers get ready access to accurate and up-to-date menus listing food restaurants are willing and able to prepare for takeout or delivery, accurate and up-to-date pricing for each menu item, and accurate estimates of the time it will take for the food to be prepared and delivered.

28.     For restaurants, Grubhub offers those with excess capacity an additional way of generating takeout and delivery orders. Grubhub can also generate internet advertising for restaurants who lack an online presence and want one through Grubhub. And for restaurants who do not offer delivery but want to, Grubhub can offer a ready-made delivery infrastructure.

29.     For Grubhub, its partnerships with restaurants allow the company to use those restaurants' names, logos, and strong local reputations to attract users to its platform. Grubhub then charges restaurants a percentage of the takeout and delivery orders it generates through its platform and associated internet advertising.

**B.      Grubhub Tells Consumers It's Working Cooperatively with Restaurants**

30.      Since its founding in 2004, Grubhub had only included restaurants on its platform who had agreed to appear and explicitly given Grubhub permission to use their names and logos.

31.      As Grubhub put it, "From the very beginning, our business has been connecting restaurants with diners to help our restaurant partners grow their profits. This has not changed."

32.      Grubhub's partnership with local restaurants is a central feature of the Grubhub platform and one that consumers have come to expect. The efficiencies and "direct line into the kitchen" that Grubhub promises consumers depend on those partnerships. Without restaurants' permission and cooperation, consumers cannot be assured that they are receiving accurate, up-to-date information about the food local restaurants are able and willing to prepare for takeout or delivery.

33.      Grubhub has repeatedly emphasized its partnerships with restaurants in its marketing to consumers. For example, in a press release announcing that Grubhub had reached a nationwide partnership agreement with Shake Shack, Grubhub touted itself as the food-ordering platform with "the largest and most comprehensive network of restaurant partners" and stressed that it was "proud to work with more than 140,000 restaurant partners in over 2,700 U.S. cities and London." Grubhub used similar language in numerous other press releases and consumer marketing.

34.      In describing Grubhub's appeal for consumers, Grubhub's former Chief Operating Officer likewise stressed the importance of partnerships with local

restaurants: "Diner downloads our app, or goes to the site at grubhub.com, and from there they're able to look at a plethora of restaurants that we have formed partnerships with where we're able to list their content on our website. Diners are then really able to go in and see what are the restaurants that deliver to me, what are the restaurants I can pick up from."

35. Grubhub's statement that partnerships enable it to list local restaurants' content on its website reflects both the law and consumers' understanding: if a restaurant is listed on Grubhub's platform, the restaurant has given Grubhub permission to use its name and logos, and is working cooperatively with Grubhub to provide takeout and food delivery services.

**C. Grubhub Decides to Add Unaffiliated Restaurants to Its Website and Mobile Apps Without the Restaurants' Permission**

36. Grubhub's business model proved a tremendous success with consumers. By 2018, the company had over 15 million active users and continued to project rapid growth—leading to a market capitalization in the billions.

37. In October 2019, however, Grubhub was forced to slash its projections, as competing services like DoorDash and Uber Eats were gaining in popularity and cutting into Grubhub's market share and expected revenue.

38. As soon as Grubhub announced its revised earnings projections, its stock cratered—losing more than 40% of its value in a single day—and Grubhub received downgrades from several market analysts, including double downgrades from Bank of America Merrill Lynch and Oppenheimer.

39.    In response, Grubhub told stockholders it intended to aggressively increase the number of restaurants available to users through the Grubhub platform. The company's research indicated that "the number one thing that matters to consumers is restaurants," and so by adding more restaurants to its platform, Grubhub expected both that it could "capture new diners that we otherwise might not have captured" and that those diners would be "willing to pay more" for hard-to-find restaurants.

40.    The problem was that attracting new restaurant partners, and negotiating agreements under which Grubhub could use those restaurants' names and logos to attract customers, would take time. And Grubhub didn't want to wait. The company was looking for a quick return to the rapid growth and astronomical market valuations it had previously enjoyed.

41.    So Grubhub decided it would simply include restaurants on its platform without their permission. Forming new partnerships would have been difficult, time-consuming, and expensive. But as Grubhub told shareholders, "it is extremely efficient and cheap to add non-partnered inventory to our platform."  Within three months, Grubhub had added more than 150,000 restaurants to its web site and mobile apps without first obtaining those restaurants' permission.

42.    Grubhub's decision has proven highly lucrative for the company. Its stock quickly recovered as, only one quarter after badly missing its performance targets, Grubhub was able to report metrics "at the very high end of our expectations."

43. Grubhub attributed its increased growth and revenue figures to its new strategy of listing unaffiliated restaurants on its platform and told shareholders it expected the strategy to continue spurring increased growth throughout 2020.

44. In June 2020, Grubhub announced it had reached an agreement to sell its platform for $7.3 billion—more than twice what the platform was worth before Grubhub started adding restaurants to it without their consent.

### D. Grubhub's Unauthorized Use of Restaurants' Names and Logos Misleads Consumers and Harms Restaurants

45. Grubhub's decision to add unaffiliated restaurants to its platform may have reaped immediate dividends for Grubhub, but those gains came at the expense of restaurants—who had good reasons for choosing not to partner with Grubhub.

46. By including those restaurants on its platform anyway, Grubhub is misleading consumers, who reasonably believe the restaurants have partnered with Grubhub and will be working cooperatively with Grubhub to provide them with accurate, reliable, and timely service.

47. When Grubhub instead provides what it admits is a "suboptimal diner experience rife with operational challenges," consumers understandably blame the restaurants—who they assume are working with Grubhub and who they now associate with a bad dining experience.

### 1. Restaurants Have Good Reasons for Choosing Not To Work With Grubhub

48. While there are good reasons a restaurant might choose to partner with Grubhub, there are also plenty of reasons that restaurants choose not to.

a.  *Don't need or want additional orders*: Grubhub works best for restaurants who need its advertising power to generate consumer demand. Popular local restaurants that already attract lots of customers often don't need or want additional orders. They might not have the capacity to fill more orders without disrupting normal operations, overburdening staff, or sacrificing the quality that made them popular in the first place.

b.  *Don't want to lose control over customer service*: When a restaurant agrees to let Grubhub take over the ordering and food delivery process, they also lose a substantial degree of control over the customer's experience. For restaurants that built their business on a sterling reputation for customer satisfaction, that's not a compromise they are willing to make.

c.  *Grubhub drivers are sometimes late or unprofessional*: Some restaurants have complained that Grubhub employees hurt their reputation by delivering customers' food late and cold. Grubhub may not ensure that its drivers pick up food as soon as it is ready and Grubhub drivers often "stack" orders, meaning they wait for subsequent orders to be ready rather than delivering each customer's food immediately after picking it up. Restaurants also report receiving customer complaints due to a variety of unprofessional behavior by certain Grubhub drivers, including stealing food.

d.  *Too many cancelled orders or customer refunds*:  Grubhub makes it easy for consumers to order food, but that effortlessness can lead to a lot of cancelled orders that cause restaurants to waste food and lose money. Grubhub also has drawn criticism for

issuing refunds without first contacting the restaurant to verify that a refund is warranted, which also costs the restaurant money.

e. *Don't want to provide takeout or delivery*: While takeout and delivery are appropriate for some types of food, many establishments want to ensure that their food is enjoyed promptly after preparation. They may therefore choose not to offer takeout or delivery.

f. *Want tips to go to their employees*: When a customer orders through Grubhub, the restaurants' employees don't receive any tips, which instead go to Grubhub and its drivers.

g. *Restaurants have their own delivery services*: Many restaurants have their own delivery services, through which they can assure good customer service and timely deliveries. Grubhub's delivery infrastructure is therefore not needed or wanted, as it would compete with the restaurant's own service, in which the restaurant has already invested resources.

h. *Restaurants have partnerships with another provider*: Restaurants who do want to pay a third-party to provide delivery services will often shop around and choose a provider who offers the best deal to the restaurant, provides the best customer service, is most widely used by local consumers, or has the best history of supporting its restaurant partners. Restaurants who have partnerships with other providers often don't need or want Grubhub to provide competing delivery services.

i. *Grubhub takes too much of the restaurants' profit*: Grubhub takes a large percentage of each order from restaurants. The various commissions and fees charged

by Grubhub often exceeds 30% of the total order amount, which can leave the restaurant with few if any profits. For example, one restaurant owner posted a statement from Grubhub showing that out of $1,042.63 in 46 pre-paid owners, he received only $376.54 from Grubhub.

j. *Grubhub has a poor reputation*: Grubhub has a history of engaging in sharp business practices and treating its restaurant partners poorly. Grubhub has been accused of charging its restaurant partners for phone calls that don't result in orders, confirming orders without the restaurants' approval, and creating websites that use restaurants' names and logos without their approval. Restaurants who research Grubhub will often refuse partnership overtures as a result of that poor reputation.

49. Grubhub knew many popular local restaurants did not want to partner with Grubhub and appear on its platform. Grubhub had tried and failed to convince many such restaurants to offer food services through Grubhub's platform and knew that restaurants were increasingly wary of the many negatives that a partnership with Grubhub could bring.

50. The difficulty Grubhub was encountering attracting additional restaurants to its platform was a major reason Grubhub decided to start adding restaurants to its website and mobile apps without first obtaining the restaurants' consent or agreement.

**2.      Grubhub Knows Restaurants Don't Want Its Business and Tells Drivers to Disguise Their Affiliation with Grubhub**

51.      After Grubhub began including restaurants on its platform without their consent, consumers began ordering food from the newly added restaurants through Grubhub's website or mobile apps.

52.      Grubhub needed a way to fill those orders, but it knew that the restaurants hadn't given Grubhub permission to solicit customers on its behalf, didn't want to partner with Grubhub, and likely would not accept orders they knew came from Grubhub.

53.      Grubhub decided that rather than interacting with the restaurant directly, as it did with its restaurant partners, it would disguise the orders and make them appear as if they came directly from consumers.

54.      Grubhub told its drivers to act as if they were a diner rather than from Grubhub: they should place the order themselves using the diner's name, they should pick up food from the general consumer pickup area and not look for a Grubhub pickup spot, and they should tell the restaurant they were "picking up an order for [diner's name]," rather than picking up a Grubhub order. Drivers are also specifically told not to leave a tip.

55.      So drivers would know when to act like a Grubhub driver and when to disguise their affiliation, Grubhub made the difference between partnered restaurants and unaffiliated restaurants obvious on the drivers' mobile apps. Orders placed with unaffiliated restaurants appeared in purple and were clearly labeled by the company as

- 14 -

"Place & Pay Orders," meaning that the driver would need to place and pay for the order using the customer's name.

56.     Drivers dislike the purple, "Place & Pay Orders," which Grubhub has acknowledged are "a bad experience for drivers." As one driver wrote on an online forum for Grubhub drivers, "The entire process is sketchy, I feel dirty every time I do it. I don't like it at all but on a slow day I don't really have a whole lot of options available to me so I just suck it up." Other drivers have said online that they've started refusing to fulfill these orders altogether.

### 3.     Consumers Continue to Believe Restaurants on Grubhub are Working Cooperatively with Grubhub

57.     While Grubhub makes it very clear to its drivers which restaurants have been listed without their consent—meaning that order fulfillment will require more time and effort, as well as a little luck—Grubhub does not do the same for consumers.

58.     For 15 years, the restaurants that appeared on Grubhub's platform were willing partners and were working cooperatively with Grubhub. That is no longer the case, but Grubhub does not draw consumers' attention to the fact.

59.     Restaurants listed without their consent are not highlighted in purple as they are on Grubhub drivers' apps. Nor is there any other prominent disclosure to consumers that a particular restaurant's name or logo is used without permission; that the restaurant will not be working cooperatively with Grubhub to provide accurate, reliable, and timely service; or that because Grubhub is offering food services from the restaurant without consent, there is a much greater likelihood that the order will take

longer to fill, will be filled incorrectly, will be delivered cold, or will eventually be cancelled altogether.

60.     Because Grubhub does not tell consumers any of this, they continue to believe Grubhub is working cooperatively with the restaurants on its platform to provide accurate, reliable, and timely service. This has led to a great deal of confusion and frustration for consumers who think they are getting a "direct line to the kitchen."

61.     Consumers frequently call restaurants who are unaffiliated with Grubhub to ask about orders they placed on Grubhub—orders the restaurants know nothing about. One restaurant chef and owner told *Wired*, for example, that he had received mysterious calls about delivery for weeks, asking for things like an extra gallon of iced tea with an order. He eventually figured out the source of the confusion: Grubhub had created a webpage for his restaurant without his consent.

62.     Many other restaurant owners have conveyed similar stories, as have consumers, including on online forums that Grubhub monitors and that are designated for discussions about Grubhub.

63.     Grubhub drivers have similarly reported that consumers don't realize that some restaurants with Grubhub pages are not actually affiliated with Grubhub. For example, after one driver explained to a customer why she had difficulty getting her order filled: "She had been so happy to see this restaurant finally delivered and I could see her heart kind of broke a bit when I told her how shady [Grubhub] had been."

### 4. Customer Confusion Leads to Poor Experiences that Hurt Restaurants' Hard-Earned Reputations

64.     Grubhub knows that including restaurants on its website and mobile apps without permission leads to "a bad experience for diners," but continues to do so anyway.

65.     When a consumer uses Grubhub to order from a restaurant who has willingly partnered with Grubhub, the order is conveyed directly to the restaurant, who can quickly confirm their ability to fill the order, begin preparing the food right away, and coordinate with Grubhub to ensure the food is picked up and delivered as soon as it is ready.

66.     But when a consumer places an order with a restaurant who has been included on Grubhub's platform without permission, the process becomes—in Grubhub's own words—"expensive for everyone, a suboptimal diner experience and rife with operational challenges."

67.     The order doesn't go directly to the restaurant, it goes instead to a Grubhub driver, who must first figure out how to contact the restaurant and place the order. Sometimes it's possible to place orders with the restaurant by phone, but other times the restaurant will only accept orders in person. The extra steps often lead to mistakes in customers' orders and often the restaurant won't receive the order at all.

68.     Another source of mistakes and confusion are the menus Grubhub includes on its app and website. Because Grubhub is not coordinating with the restaurant, it often uses outdated menus—causing restaurants to receive numerous

orders for food that is sold out or that they no longer make. Grubhub drivers must then contact the customer by phone to ask for a substitute, order something similar, or cancel the customer's order.

69.     Even when food orders are successfully placed, pickup and delivery are not as well coordinated as they are when the restaurant is a willing participant. Drivers may be late to pick up the food, if they show up at all, and customers' food is more likely to be cold or otherwise unsatisfactory when it is eventually delivered.

70.     Restaurants also can struggle to keep up with the extra demand created by Grubhub's unauthorized use of their names and logos. These are restaurants who have chosen not to partner with Grubhub, often because they do not need or want more orders. Processing and fulfilling Grubhub orders requires restaurants to divert employees from other vital functions and can lead to long wait times and worse customer service for the restaurants' existing customers.

71.     Due to the harm Grubhub's conduct causes restaurants, if at any step in the process the restaurant realizes an order comes from Grubhub, it may refuse to complete the order. In that event, customers are rarely told what happened—instead Grubhub cancels the order without explanation or assigns it to another Grubhub driver for another attempt.

72.     Drivers also don't like the added hassle and inherent dishonesty in these orders and will often refuse to fill the order or abandon it midway through. Again, customers are rarely told what happened, their orders are simply cancelled without explanation or assigned to another driver, resulting in further delay.

73.     So while consumers believe they are getting a "direct line to the kitchen," what they actually receive are all the "inefficiencies, inaccuracies and frustrations associated with paper menus and phone orders"—and then some. Or as Grubhub puts it, "there tends to be more problems with these orders."

74.     The poor service that Grubhub provides while using restaurants' names and logos hurts the restaurants' reputations. "We look bad to our customers," is how one restaurant owner put it to *The Philadelphia Inquirer*. Those customers understandably blame the restaurant, at least in part, and frequently leave bad online reviews for the restaurant as a result of their experience ordering through Grubhub.

75.     To make matters worse, restaurants often don't even realize that a customer has had a bad experience. Grubhub hides its involvement from the restaurants and doesn't share any negative feedback it receives from the customer. The restaurant cannot communicate with the customer to explain what happened or offer to make it right. Grubhub is depriving restaurants of control over customer satisfaction— the lifeblood of any successful local establishment.

### 5.     Grubhub Diverts and Impairs Demand for Local Restaurants

76.     When deciding which restaurants to list on its platform without permission, Grubhub targets restaurants that local diners frequently search for online.

77.     Grubhub then uses search engine marketing and optimizations to divert that restaurant's potential customers to its own business. As Grubhub boasted to shareholders, "if a diner is looking online for a specific restaurant, they can find us in SEM or SEO now as a non-partnered restaurant[], whereas before they couldn't."

78.     In many instances, Grubhub has made arrangements with Google so that the "Order Delivery" button on restaurant's Google business listing links to Grubhub's delivery service rather than to the restaurant's delivery service.

79.     The strategy has been successful, as unsuspecting consumers think they are ordering from the restaurant's authorized delivery service and become Grubhub customers instead. Grubhub has confirmed to investors that, in this way, non-partnered restaurants "help us acquire new diners."

80.     But by diverting consumer demand for non-partnered restaurants, Grubhub's conduct hurts restaurants in several ways.

81.     It takes business from the restaurants' own takeout and delivery services, which a customer is less likely to see or recognize as distinct from Grubhub's offering.

82.     It takes business away from the restaurants' authorized third-party delivery services, which can include up-to-date menus and work closely with the restaurant to ensure customer satisfaction.

83.     And it costs the restaurants business and impairs future demand. Once Grubhub has the potential customer's attention, it encourages that customer to consider ordering from one of its partnered restaurants instead—which will give Grubhub a bigger cut of the business. As Grubhub admits to investors, "we're going to do whatever we can to route demand to partnered restaurants."

84.     One of the ways Grubhub does this is by posting menus with inflated prices. As one commenter wrote on a forum for Grubhub drivers, "From non-partnered restaurants, [Grubhub] makes its money by marking up the menu prices. Many

restaurants don't like this because it makes their food appear more expensive to the customer, who may then choose to never visit in-person."

85.     Another way is to create landing pages for unaffiliated restaurants that claim the restaurant is not accepting orders and suggesting one of Grubhub's partner restaurants as an alternative. Grubhub does this even if the restaurant is open and accepting orders.

86.     Since the inception of this lawsuit and another lawsuit in Colorado concerning Grubhub's practice of falsely advertising restaurants as closed, Grubhub has added a disclaimer to some of its restaurant pages. Whereas the name of the restaurant, the word "Closed" and the sentence "This restaurant is not accepting order on Grubhub" appear in prominent bold type, Grubhub has added in smaller, unbolded type that "This restaurant is unaffiliated with Grubhub. Items or hours may differ in-store." The disclaimer is neither prominent enough nor clear enough to avoid consumer deception, and the only purpose of using restaurant's names and logos in this context is to divert consumer interest intended for the restaurant to Grubhub and to other restaurants that have partnered with Grubhub.

**E.     Grubhub Knows It Is Harming Restaurants and Uses That Harm to Force Restaurants Into Unwanted Partnerships**

87.     Grubhub knows it's hurting restaurants. When the company began including unaffiliated restaurants on its platform, it told shareholders that the result would be a bad experience for these restaurants and a bad experience for their

customers. Grubhub also affirmed that is still believed partnering with restaurants, rather than using their names and logos without consent, was the right path forward.

88.     One of the reasons Grubhub chose to deliberately create a bad experience for restaurants and their customers was to force those restaurants into partnerships. As Grubhub's CEO told investors, "it's our job over time to make those restaurants – turn those restaurants into partnered restaurants."

89.     When investors asked why restaurants would choose to become partners after being listed on Grubhub's webpages and mobile apps without their permission, Grubhub's CEO answered, "it's because the diner experience sucks."

90.     In other words, Grubhub is intentionally harming restaurants' local reputations and then offering them a partnership to make the harm stop—a partnership where Grubhub will keep 30% or more from each order.

91.     That's why, as soon as Grubhub started harming restaurants' reputations by using their names and logos without permission, it also announced it was "deploying a sales team to try to convert these restaurants to partners, because it's a better experience for anyone involved."

## PLAINTIFFS' EXPERIENCE

### A.     Lynn Scott, LLC

92.     Plaintiff Lynn Scott, LLC, owns and operates Antonia's, a popular local restaurant that serves Italian-inspired fare in the heart of downtown Hillsborough, North Carolina.

93.    Grubhub approached Lynn Scott about entering into a partnership that would authorize Grubhub to list Antonia's on its platform, but Lynn Scott declined Grubhub's offer. Grubhub decided to list Antonia's on its platform anyway.

94.    Grubhub created at least two webpages for Antonia's. When consumers searched for Antonia's online, they were directed to these webpages. A screenshot from



one of the webpages is shown below. The other webpage is similar but includes the Seamless brand instead of the Grubhub brand in the upper left-hand corner.

95.     These webpages use Antonia's name and logo and suggest an affiliation between Antonia's and Grubhub that does not exist.

96.     The FAQs at the bottom of the page further suggest an affiliation that does not exist. They read:

## FAQs

**Q) Does Antonia's Restaurant (101 N Churton S) deliver?**
A) Yes, Antonia's Restaurant (101 N Churton S) delivery is available on Grubhub.

**Q) Does Antonia's Restaurant (101 N Churton S) offer contact-free delivery?**
A) Yes, Antonia's Restaurant (101 N Churton S) provides contact-free delivery with Grubhub.

97.     In fact, Antonia's has never worked "with Grubhub" to offer or provide food delivery services. Grubhub was using Antonia's name and logo without permission.

98.     Grubhub's unauthorized listing of Antonia's on its platform is misleading and confusing for consumers, who reasonably expect that Grubhub is working cooperatively with Antonia's to ensure the consumer receives accurate, reliable, and timely service.

99.     Consumers who ordered Antonia's through Grubhub did not get the "direct line to the kitchen" and coordinated delivery they were expecting—causing harm to Antonia's hard-earned reputation.

100.    For instance, Grubhub posted an Antonia's menu on its platform that was a year old. As a result, Antonia's received orders for food items that were not available and had to scramble to make off-menu items for customers or risk disappointing their valued customers. When Antonia's simply did not had the ingredients to fill orders

placed through Grubhub, customers blame the restaurant and associate it with poor service. Plaintiff has spoken directly with customers who were understandably upset with Antonia's after the orders they placed on Grubhub's platform could not be filled.

101.    Lynn Scott asked Grubhub to both stop listing Antonia's on its platform, but Grubhub did not stop. After Plaintiff filed this lawsuit, Grubhub made its primary landing page for Antonia's less accessible, but to this day, Grubhub continues to use Antonia's name and logo on its platform without consent.

### B.    The Farmer's Wife, LLC

102.    The Farmer's Wife is a popular local restaurant in Sebastopol, California, owned and operated by The Farmer's Wife, LLC. The restaurant is a regular participant in local farmer's markets and is known for its use of fresh, locally sourced, organic ingredients.

103.    The Farmer's Wife does not offer food delivery: it knows that poor food quality reflects poorly on the restaurant and is unwilling to partner with Grubhub or

another third party and surrender control over the quality of food and service its customers receive when they place an order with The Farmer's Wife.

104.    Plaintiff learned in 2019, however, that Grubhub was listing The Farmer's Wife on its platform without permission. The following screenshots were taken from Grubhub's mobile app.



105.    Grubhub has also created at least two webpages for The Farmer's Wife that use the restaurants' name and logo in a similar manner, offer the same menu, and suggest an affiliation that does not exist.

106.    The menu that Grubhub attributes to The Farmer's Wife on its platform is inaccurate and suggests that The Farmer's Wife is offering to make food that it does not actually make and has never made.

107.    As a result, when a customer ordered from The Farmer's Wife on Grubhub, those orders sometimes could not be fulfilled—resulting in a poor customer experience that reflects badly on The Farmer's Wife.

108.    Grubhub's inaccurate menu also poses a threat to The Farmer's Wife's hard-earned reputation because the foods listed are inconsistent with The Farmer's Wife commitment to organic, locally sourced fresh food.

109.    The Farmer's Wife has asked Grubhub to remove its listings, but Grubhub did not stop. After Plaintiff filed this lawsuit, Grubhub made its primary landing page for The Farmer's Wife less accessible, but to this day, Grubhub continues to use restaurant's name and logo on its platform without consent.

110.    Several other restauranteurs have similarly reported that Grubhub will not stop using their restaurants' names and logos, even after they complained to Grubhub on multiple occasions.

**C.      Thuan Luu**

111.    Plaintiff Thuan Luu owns and operates Ragin' Crawfish, a popular seafood restaurant in Oxnard, California.

112.    Ragin' Crawfish previously partnered with the Eat24 food ordering and delivery platform. Eat24 was permitted to use Ragin' Crawfish's name and logo to offer customers food services from a network of affiliated restaurants, and Ragin' Crawfish coordinated with Eat24 to ensure customers received the Ragin' Crawfish food they ordered on the platform in a timely and reliable manner. If customers had questions or concerns, or wanted to place their order directly with the restaurant, they could call Ragin' Crawfish directly through the Eat24 platform.

113.    Grubhub subsequently acquired Eat24, but in or around May 2020, Ragin' Crawfish discovered that Grubhub had been charging it a flat fee every time a customer called it through its platform—even if the telephone call was purely informational. That business practice has been widely criticized and led to several lawsuits. When Ragin' Crawfish discovered the practice, it terminated its partnership with Grubhub.

114.    Several months after Ragin' Crawfish terminated its partnership with Grubhub, customers began expressing surprise that Ragin' Crawfish was open. Some commented that they were glad to see the restaurant was open again, which confused Plaintiff because the restaurant had not changed its hours or temporarily closed its doors. Eventually, Plaintiff learned from a loyal customer that Ragin' Crawfish was listed on Grubhub as closed.

115.    Grubhub did not have Plaintiff's position to continue using Ragin' Crawfish's name and logo on its platform, but it did so anyway. Grubhub's continued use of Ragin' Crawfish's name and logo suggested an affiliation that no longer existed and harmed the restaurant's business. Customers who searched for Ragin' Crawfish

online were redirected to Grubhub's platform, where they were incorrectly told that Ragin' Crawfish was closed and encouraged to order from another restaurant on Grubhub—costing Ragin' Crawfish business.

116.    Plaintiff contacted Grubhub multiple times to complain, but Grubhub's representatives told Ragin' Crawfish that they could not do anything and would need to speak to others at Grubhub. It took Plaintiffs several attempts before Grubhub removed Ragin' Crawfish from its platform and stopped its unauthorized use of Ragin' Crawfish's name and logo.

117.    Many restaurant owners have reported similar difficulties convincing Grubhub to remove their restaurant's name from its platform, and on several occasions, even if Grubhub removes restaurants for a while, it will resume listing those restaurants at a later date.

### D.    Old Crown, Inc.

118.    Plaintiff Old Crown, Inc., owns and operates a popular coffee shop in Fort Wayne, Indiana, called Old Crown Coffee Roasters. To increase the appeal of its platform to consumers, Grubhub attempted to partner with Old Crown Coffee Roasters on several occasions, but Plaintiff repeatedly declined.

119.    In December 2020, Plaintiff learned that Grubhub had decided to use Old Crown Coffee Roasters' name and logo on its platform anyway. After a Grubhub driver attempted to pay for a pickup order using a Grubhub-branded credit card, Plaintiff went online and saw that Old Crown Coffee Roasters was listed on Grubhub's platform along with an outdated menu.

120. Grubhub's use of Old Crown Coffee Roasters' name and logo suggested an affiliation that did not exist, was likely to confuse consumers, and harmed Plaintiff's business.

121. On at least one occasion, a Grubhub driver's attempt to pay using a Grubhub-branded credit card was unsuccessful and so the customer's order went unfilled. When a customer has a bad experience ordering from Old Crown Coffee Roasters through Grubhub, the customer is likely to blame the Old Crown and associate it with a poor experience—harming Old Crown's reputation in the community and making it less likely that consumer will order from Old Crown in the future.

122. Old Crown had to complain to Grubhub multiple times via phone and email and before Grubhub made its primary landing page for Old Crown Coffee Roasters less accessible. But at the time of the filing of this complaint, Grubhub continues to use the restaurant's name and logo on its platform without consent.

**E.  La Mesa LLC**

123. Plaintiff La Mesa LLC owns and operates La Mesa Modern Mexican in Saint Charles, Illinois. La Mesa Modern Mexican serves authentic Mexican cuisine with a modern flare.

124. Shortly after the La Mesa Modern Mexican opened in July 2019, Grubhub began using the restaurant's name and logo on its platform without first obtaining La Mesa's consent. Grubhub's unauthorized use of the restaurant's name and logo has disrupted La Mesa's operations and damaged its reputation.

125.    Consumers who see La Mesa Modern Mexican's name and logo, alongside the restaurant's address and a menu of food items offered for delivery, they understandably assume that La Mesa is affiliated with Grubhub and blame La Mesa for Grubhub's poor service.

126.    La Mesa has received poor reviews on Yelp and social media accounts when consumers have received poor service from Grubhub and blamed the restaurant. To maintain customer loyalty, La Mesa has needed to issue refunds to customers after Grubhub delivered La Mesa Modern Mexican food to consumers late, cold, or in bad condition; delivered the wrong food; charged consumers an inflated price for La Mesa's food; or failed to fulfill consumers' order at all.

127.    La Mesa complained to Grubhub on multiple occasions and asked to be removed from its platform, only to be told that the restaurant needed to fill out a form, which was subsequently ignored. Grubhub refused to stop using La Mesa's restaurant name and logo without permission until one of La Mesa's managing members filed a declaration in the District Court of Colorado to voice its objection to a proposed class settlement that would have allowed Grubhub to continue using restaurant's names and logos without consent, without compensating restaurants, and without notifying restaurants about the proposed settlement.

**F.      132 Degrees, LLC**

128.    Plaintiff 132 Degrees, LLC, owns and operates Fahrenheit 132° — a popular steak house in Fredericksburg, Virgina.

129.     Grubhub used Fahrenheit 132's name and logo on its platform without authorization—misleading consumers, disrupting Plaintiff's business, and damaging Fahrenheit 132's reputation.

130.     Consumers who saw Fahrenheit 132's name and logo on Grubhub's platform—along with the restaurant's address and a menu of food items offered for delivery—understandably believed that Fahrenheit 132 was affiliated with Grubhub and blamed the restaurant for the poor service they received after placing an order.

131.     Several angry customers complained about receiving the wrong order, inflated prices, and late deliveries of cold food, and now associate those poor experiences with Fahrenheit 132. But the fault lies with Grubhub, which was not working collaboratively with Fahrenheit 132 and listed an outdated menu with incorrect prices. To help preserve its reputation in the community, Plaintiff was forced to devote significant time and money to damage control—including by reimbursing customers the money they paid to Grubhub for food from Fahrenheit 132.

132.     Plaintiff contacted Grubhub repeatedly and asked them to remove Fahrenheit 132 from its platform. It took weeks before Grubhub did anything, and even then, Grubhub only reduced the extent to which it used Fahrenheit 132's name and logo without permission.

133.     To this day, Grubhub continues to use Fahrenheit's name on AllMenus, where it appears alongside the restaurant's address and an outdated menu. The AllMenus landing page also provides an option to "Order with Grubhub." If a customer clicks on "Order with Grubhub," they are taken to a Grubhub landing page where

Fahrenheit 132's name and logo appear alongside a message that the restaurant is "Closed" and "not accepting orders on Grubhub."

134.    When consumers see Fahrenheit 132's name and address on AllMenus, they believe that Fahrenheit 132 is affiliated with AllMenus and provided AllMenus with the menu items and prices that appear on AllMenus. Several customers have angrily complained that Fahrenheit 132's actual prices are significantly higher than the outdated prices listed on AllMenus. They blame Plaintiff and believe the restaurant is guilty of a "bait and switch," when in fact, Grubhub is using Fahrenheit 132's name and logo without authorization.

### G.    MDR, LLC

135.    Plaintiff MDR, LLC, owns and operates El Paraiso restaurant in Reisterstown, Maryland. El Paraiso specializes in authentic Mexican cuisine and its food is freshly prepared and cooked to order.

136.    Grubhub used El Paraiso's name and logo on its platform without authorization—misleading consumers, disrupting Plaintiff's business, and damaging El Paraiso's reputation.

137.    For example, Grubhub drivers would place orders with El Paraiso that the restaurant was unable to accurately prepare because Grubhub had posted an outdated menu; arrive with orders when the restaurant was at capacity and had no ability to prepare food for immediate delivery; and would wait for their orders to be filled at tables that otherwise could have been used for El Paraiso's diners.

138.    Consumers who saw El Paraiso's name and logo on Grubhub's platform—along with the restaurant's address and a menu of food items offered for delivery—understandably believed that El Paraiso was affiliated with Grubhub and blamed the restaurant for the poor service they received after placing an order through Grubhub.

139.    El Paraiso has received bad reviews when orders placed through Grubhub took a long time to arrive and now associate El Paraiso with poor diner experiences. Plaintiff has no way of contacting these consumers to explain that their poor experience was caused by Grubhub, who listed El Paraiso on its platform without permission and using an inaccurate menu.

140.    MDR has an agreement with UberEats and DoorDash to provide delivery services for the restaurant. To maintain a positive customer experience, MDR provides them with limited menu items that it knows the restaurant's employees can prepare quickly and are suitable for delivery. MDR has never contracted with Grubhub for delivery services or agreed that Grubhub could use its name and logo to attract users to the Grubhub platform.

141.    Grubhub has ignored MDR's wishes and continued using El Paraiso's name and logo without consent. After El Paraiso filed a declaration in related litigation currently pending in the District of Colorado, Grubhub made its primary landing page for El Paraiso less accessible, but to this day, Grubhub continues to use restaurant's name and logo on its platform without consent.

### H.    Momobbq, Co., LLC

142.    Momobbq, Co., LLC, owns and operates MoMoBBQ restaurant in Mechanicsburg, Pennsylvania. MoMoBBQ serves classic American meat, cured and prepared in the traditional southern BBQ way.

143.    Shortly after MoMoBBQ opened in January 2020, Grubhub began contacting the restaurant on a regular basis and asking MoMoBBQ to become one of its partner restaurants. Momobbq told Grubhub that it was not interested and to stop calling.

144.    But Momobbq later discovered that Grubhub was using its name and logo on its platform anyway—misleading consumers, disrupting Plaintiff's business, and damaging MoMoBBQ's reputation.

145.    For example, alongside MoMoBBQ's name, logo, and address, Grubhub included an inaccurate description of MoMoBBQ's menu items with incorrect prices. MoMoBBQ offers its customers five award-winning BBQ sauces, but when Grubhub drivers placed orders for consumers, they did not indicate which sauce or sauces the customer would like with their order.

146.    Consumers who saw MoMoBBQ's name and logo on Grubhub's platform were led to believe that MomoBBQ was affiliated with Grubhub. When they are not told about MoMoBBQ's award-winning sauces, do not receive the sauces they expect, do not receive their food promptly, or otherwise have a poor experience, consumers understandably blame the restaurant—who they think is working collaboratively with Grubhub to offer them MoMoBBQ. MoMoBBQ has no control over the customer service

that Grubhub provides and cannot explain to unhappy customers that Grubhub is using their name and logo without consent.

147.   Momobbq repeatedly told Grubhub that it did not want MoMoBBQ listed on Grubhub's platform and even submitted a complaint to the Pennsylvania State Attorney General's office. Grubhub ignored Momobbq's wishes and used the restaurant's name and logo on its platform until the restaurant filed a declaration in related litigation currently pending in the District of Colorado.

### I.   MF Tasty LLC

148.   MF Tasty LLC is the owner and operator of the MF Tasty food truck in Portland, Oregon. MF Tasty provides catering services and hosts pop-up events in the local area.

149.   The "MF Tasty" name is a federally registered trademark owned by MF Tasty, which did not authorize Grubhub to use that mark in any way. Grubhub nonetheless uses the MF Tasty name on its platform—misleading consumers, disrupting Plaintiff's business, and damaging MF Tasty's reputation.

150.   For example, Grubhub posted an outdated menu of MF Tasty food that was offered at a one-time pop-up event; when customers tried to order that food through Grubhub, their orders could not be fulfilled.

151.   Consumers who see the MF Tasty trademark on Grubhub's platform are led to believe that MF Tasty was affiliated with Grubhub. When they do not receive the MF Tasty food they ordered, receive it late and cold, are unhappy with the inflated prices Grubhub charged them, or otherwise have a poor dining experience, they blame

MF Tasty—who they think is working collaboratively with Grubhub to offer them food services.

152.    MF Tasty has no control over the customer service that Grubhub provides or the prices it charges and cannot explain to unhappy customers that Grubhub is using its trademark without consent.

153.    Plaintiff contacted Grubhub and requested that the company remove MF Tasty from its platform. The Grubhub representative told MF Tasty it would submit a ticket to have the restaurant removed, but Grubhub instead updated the menu it posted and kept using the MF Tasty name. Plaintiff again contacted Grubhub and requested that Grubhub stop using the MF Tasty name on its platform.

154.    As of the date of this complaint, Grubhub was still using the "MF Tasty" mark on its platform without consent.

**J.    Iowa City Coffee Company**

155.    Iowa City Coffee Company owns and operates the Heirloom Salad Company and The Java House. The Heirloom Salad Company has three locations in Iowa City, Iowa, and one location in North Liberty, Iowa. The Java House has four locations in Iowa City, Iowa, and one location in North Liberty, Iowa.

156.    The "Heirloom Salad Company" name is a federally registered trademark owned by Iowa City Coffee Company, which did not authorize Grubhub to use that mark in any way. Nor did Plaintiff authorize Grubhub to use its Iowa-registered trademark for "The Java House." Grubhub nonetheless uses both trademarks on its

platform—misleading consumers, disrupting Plaintiff's business, and damaging the restaurants' reputation.

157.    For example, alongside the restaurants' names, logos, and addresses, Grubhub included outdated menu items and incorrect pictures—leading to orders that could not be filled accurately or did not appear as pictured.

158.    Consumers who see Plaintiff's trademarks on the Grubhub's platform are led to believe that the restaurants are affiliated with Grubhub. When they do not receive the food they ordered, receive it late and cold, are unhappy with the inflated prices Grubhub charged them, or otherwise have a poor dining experience, they blame the restaurants—who they think are working collaboratively with Grubhub to offer them food services.

159.    Several years ago, after Plaintiff first noticed its restaurants were listed on Grubhub's platform without authorization, Plaintiff began repeatedly asking Grubhub to remove its restaurants from the Grubhub platform. Grubhub would sometimes remove the listing for one of the restaurant's locations. But other locations would remain listed and new locations might later appear as well.

160.    It was very difficult for Plaintiff's management to keep track of when Grubhub listed its restaurants and felt to them like a game of whack-a-mole: after they finally managed to have one restaurant from Grubhub's platform, another restaurant would poop up in its place.

161.     At one point, Plaintiff told one of its restaurant managers to refuse Grubhub orders. Soon thereafter, Grubhub began inaccurately listing the restaurants as "closed" on its platform.

162.     After Plaintiff filed a declaration in related litigation currently pending in the District of Colorado, Grubhub made its primary landing pages for the restaurants less accessible, but to this day, Grubhub continues to use both the "Heirloom Salad Company" mark and "The Java House" mark on its platform without consent.

## CLASS ALLEGATIONS

163.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek to pursue their claims on behalf a class and subclass of similarly situated persons. The parameters of the classes may be refined through discovery and will be subject to Court approval and modification, but for purposes of this complaint, Plaintiffs propose the following class definitions:

### Class

All businesses whose names or logos were used without their permission on Grubhub, Seamless, LevelUp, AllMenus, MenuPages, or any other part of the Grubhub online platform.

### Registered Mark Subclass

All class members whose names or logos were registered with the United States Patent and Trademark Office when they were used without their permission on Grubhub, Seamless, LevelUp, AllMenus, MenuPages, or any other part of the Grubhub online platform.

164.     The proposed class and subclass meet the requirements for class certification pursuant to Rule 23(a) and Rule 23(b)(3).

165.    *Numerosity*: The class and subclass are sufficiently numerous such that individual joinders are impracticable. In the fourth quarter of 2019 alone, Grubhub listed some 150,000 restaurants on its platform without permission.

166.    *Commonality:* Plaintiffs' and class members' claims against Grubhub present common questions of law and fact, including:

   a.    Is Grubhub's inclusion of unaffiliated restaurants on its platform likely to cause confusion as to the restaurants' affiliation with Grubhub?

   b.    Is Grubhub's inclusion of unaffiliated restaurants on its platform likely to cause confusion as to the origin, sponsorship, or approval of the food service offered through Grubhub's website and mobile apps?

   c.    How much has Grubhub profited by including unaffiliated restaurants on its website and mobile apps without permission?

167.    *Typicality:* Plaintiffs' claims against Grubhub are typical of the class's claims. Plaintiffs and class members were all included on Grubhub's food-services platform without permission, each has claims against Grubhub arising from the unauthorized use of their names and logos, and each of those claims will depend on a common showing that consumers are likely to be confused by Grubhub's inclusion of unaffiliated restaurants on its website.

168.    *Adequacy*: Plaintiffs will fairly and adequately protect class members' interests. Plaintiffs' interests are aligned with those of the class and subclass, as each seeks to hold Grubhub liable for including them on its online platform without their

permission, and Plaintiffs have retained experienced counsel to represent the class's interests.

169.     *Predominance*: The common questions identified above are likely to predominate at trial when compared to any individualized issues that may arise. The major issues upon which Grubhub's liability depends—in particular, the issue of whether Grubhub's inclusion of unaffiliated restaurants on its website and mobile apps is likely to cause customer confusion—are susceptible to generalized proof that could establish Grubhub's liability as to all class members through a single trial.

170.     *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Successfully prosecuting class members' claims will likely take several years and involve extensive pre-trial litigation against a multi-billion-dollar company, large amounts of electronically stored information, and multiple expert witnesses. These are matters that are best handled through unified class-wide representation, which can be conducted on a contingency basis and offers class members economies of scale unavailable in individual proceedings. A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

## FIRST CAUSE OF ACTION
### Violation of Lanham Act – Section 43(a)

171.     Plaintiffs allege this cause of action on behalf of themselves and the proposed class, and in so doing, incorporate all preceding allegations.

172.     Grubhub's conduct as alleged herein violates Section 43(a) of the Lanham Act, which prohibits the use in commerce of any word, term, name, symbol, or device that is likely to cause confusion as to Grubhub's affiliation, connection, or association with another business, or as to the origin, sponsorship, or approval of Grubhub's goods, services, or commercial activities by another business. 15 U.S.C. § 1125(a). Grubhub's inclusion of unaffiliated restaurants on its online platform—which includes making landing pages for the restaurants with their names, logos, addresses, menu items, and prices for each menu item, as well as using search-engine optimizations and marketing to draw consumer attention to those pages—is an act occurring in interstate commerce and in connection with goods or services.

173.     Grubhub's inclusion of unaffiliated restaurants on its online platform is likely to cause—and has in fact caused—customer confusion as to those restaurants' affiliation, connection, or association with Grubhub, as well as the source of the services offered through Grubhub's website and mobile apps. Consumers reasonably believe that Grubhub's inclusion of restaurants on its webpages and mobile apps means that Grubhub has partnered with and is working cooperatively with those restaurants to provide accurate, reliable, and timely food services.

174.     Grubhub's inclusion of unaffiliated restaurants on its online platform is also likely to cause—and has in fact caused—customer confusion as to those restaurants' sponsorship or approval of Grubhub's commercial activities. Consumers reasonably believe that restaurants have approved Grubhub's offering and are willing and able to prepare food for them as part of the service Grubhub is offering.

175.    In fact, Plaintiffs and class members are not affiliated with Grubhub, have not approved Grubhub's offerings, and have suffered damages as a result of customer confusion, including harm to their reputations and loss of customers diverted by Grubhub's deceptive practices.

176.    Pursuant to 15 U.S.C. § 1117, Plaintiffs and class members seek an award of defendant's profits, damages according to proof and as the Court may allow, costs of suit, and attorneys' fees.

177.    Plaintiffs and class members also seek injunctive relief prohibiting Grubhub from including unaffiliated restaurants on its platform pursuant to 15 U.S.C. § 1116, or requiring Grubhub to take appropriate affirmative steps to avoid customer confusion.

### SECOND CAUSE OF ACTION
### Violation of Lanham Act – Section 32

178.    Plaintiffs MF Tasty LLC and Iowa City Coffee Company allege this cause of action on their own behalf and on behalf of the proposed Registered Mark Subclass, and in so doing, incorporate all preceding allegations.

179.    Grubhub's conduct as alleged herein constitutes trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

180.    Grubhub has used Plaintiffs' and subclass members' registered marks in interstate commerce without consent and in connection with the sale, offering, or advertising of goods or services.

181. Grubhub has used Plaintiffs' and subclass members' registered marks on its website and mobile apps; on landing pages that include the restaurants' names, addresses, menu items, and prices for each menu item; and in search-engine optimizations and marketing designed to draw consumers' attention to the landing pages.

182. Grubhub's use of Plaintiffs' and subclass members' registered marks is likely to cause and has in fact caused customer confusion as to the source of the services offered through Grubhub's website and mobile apps. Consumers reasonably believe that Grubhub's use of the restaurants' trademarks mean the restaurants are working cooperatively with Grubhub to provide them with accurate, reliable, and timely food services.

183. Grubhub's use of Plaintiffs' and subclass members' registered marks is also likely to cause and has in fact caused customer confusion as to the restaurants' affiliation with Grubhub and approval of Grubhub's service. Consumers reasonably believe that Grubhub's use of the restaurants' trademarks indicate Grubhub has partnered with the restaurants, that the restaurants have approved Grubhub's offerings, and that the restaurants are willing and able to prepare food for them as part of the services Grubhub is offering.

184. In fact, Plaintiffs and subclass members are not affiliated with Grubhub, have not approved Grubhub's offerings, and have suffered damages as a result of customer confusion, including harm to their reputations and loss of customers diverted by Grubhub's infringing use of their registered marks.

185.     Pursuant to 15 U.S.C. § 1117, Plaintiffs and subclass members seek an award of defendant's profits, damages according to proof and as the Court may allow, costs of suit, and attorneys' fees.

186.     Pursuant to 15 U.S.C. § 1116, Plaintiffs and subclass members also seek injunctive relief prohibiting Grubhub from using their registered marks on its platform, or requiring Grubhub to take appropriate affirmative steps to avoid customer confusion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, request the following relief:

a.   A determination that this action may be maintained as a class action;

b.   An award of damages according to proof, including statutory damages, treble damages, and punitive damages where allowed by law;

c.   Appropriate injunctive and equitable relief;

d.   Pre-judgment interest and post-judgment interest, as provided by law;

e.   Attorneys' fees and costs of suit, including expert fees and costs;

f.   Such further relief as the Court may find just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury for all issues so triable.


Dated: August 21, 2023                    /s/ Elizabeth A. Fegan

                                          Elizabeth A. Fegan
                                          **Fegan Scott LLC**
                                          150 S. Wacker Dr.

- 45 -

24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile:  (312) 264-0100
beth@feganscott.com

Rosemary M. Rivas (*pro hac vice*)
Geoffrey A. Munroe (*pro hac vice*)
Wynne Tidwell (*pro hac vice*)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
rmr@classlawgroup.com
gam@classlawgroup.com
ewt@classlawgroup.com

*Counsel for Plaintiffs and the Proposed Class
and Subclass*